UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
ANGLIN AUTOMOTIVE LLC and THOMAS ANGLIN,                          :
                                                                  :
                                        Plaintiffs,               :
                                                                  :          23 Civ. 1404 (JPC)
                    -v-                                            :
                                                                  :          OPINION AND ORDER
                                                                  :
EBF HOLDINGS, LLC, *et al.*,                                      :
                                                                  :
                                        Defendants.               :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

This matter arises out of an alleged scheme involving predatory loan agreements directed at small businesses and disguised as agreements for the purchase and sale of these businesses' future sales income or receipts. Plaintiffs Anglin Automotive LLC ("Anglin Automotive") and its owner Thomas Anglin proceed against EBF Holdings, LLC ("Everest"), Novus Capital Funding II LLC ("Novus"), MCA Receivables, LLC, d/b/a/ Ally Funding Group ("MCA Receivables"), and Five G Funding LLC ("Five G Funding") (collectively, the "MCA-Funder Defendants")—with whom Plaintiffs entered into such agreements—as well as against various John and Jane Doe Defendants described as the officers and owners of the MCA-Funder Defendants. In their three-Count Complaint, Plaintiffs assert violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, bringing both substantive civil RICO and civil RICO conspiracy claims, and further allege a breach of contract claim.

Before the Court are motions to dismiss by Everest, Novus, and MCA Receivables (the "Moving Defendants"). Five G Funding has yet to appear in this action, and so Plaintiffs' motion for default judgment against it is also pending. For the reasons set forth below, the Court finds

that Plaintiffs have failed to plead either a substantive civil RICO claim or a civil RICO conspiracy claim, and that the identified deficiency applies equally to these claims as asserted against Five G Funding.  Accordingly, the Court dismisses Plaintiffs' RICO claims in their entirety, and further denies Plaintiffs' motion for default judgment against Five G Funding on those claims. Furthermore, the Court declines to exercise supplemental jurisdiction over Plaintiffs' breach of contract claim and thus dismisses it without prejudice to Plaintiffs' refiling the claim in state court. Finally, because Plaintiffs have yet to amend their Complaint and because permitting amendment at this early stage of the litigation would not prejudice Defendants, the Court grants Plaintiffs leave to amend the Complaint, which leave Plaintiffs are advised to take only if they are able to correct the pleading deficiencies identified in this Opinion and Order and only after they carefully consider all the substantive challenges raised by the Moving Defendants—many of which the Court does not address herein.

## I.  Background

### A.    Facts[1]

Anglin Automotive, an automotive repair facility in Ohio, is owned by Thomas Anglin. Complaint ¶¶ 22, 23.  Having suffered financially "especially during the heart of the pandemic," *id.* ¶ 24, Anglin Automotive allegedly "fell victim to a group of funders," *id.* ¶ 25, cast as predatory entities outwardly offering "funding in the form of [a] so-called [] 'merchant cash advance,'" *id.*

---

[1] The following facts, which are drawn from the Complaint, Dkt. 1 ("Complaint"), and the attached exhibits, are assumed true for purposes of this Opinion and Order.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-54 (2d Cir. 2002) (explaining that a court may consider any written instrument attached to a complaint without converting a motion to dismiss to a motion for summary judgment).

¶ 2, with the intent of ensnaring small businesses (like Anglin Automotive) in transactions that, in fact, operate as usurious loan agreements, *see id.* ¶¶ 3, 30, 76.

As described in the Complaint, an issuer of a bona fide merchant cash advance ("MCA") generally "provides a merchant with a lump sum payment in exchange for a share of the merchant's future sales income/receipts, or 'receivables,' up to a certain total repayment amount." *Id.* ¶ 26. As further described, these transactions do "not guarantee an issuer with a regular payment or a fixed, finite term"; rather, the payment terms are "reconcile[d]" "in accordance with the merchant's actual receivables"—thereby affording "certain protections for merchants by being able to reduce required payments when business is slow." *Id.* ¶¶ 27, 28.

From June through September 2022, Anglin Automotive entered into agreements with each of the named Defendants: (1) Everest is a Delaware limited liability company based in New York, *id.* ¶ 11; (2) Novus is a New York limited liability company based in New York, *id.* ¶ 12; (3) Silverline Services, Inc. ("Silverline") is a New York corporation based in New York, *id.* ¶ 13[2]; (4) MCA Receivables is a Connecticut limited liability company based in New York, *id.* ¶ 14; and (5) Five G Funding is a New York limited liability company based in New York, *id.* ¶ 15. *See id.* ¶¶ 36-70. Mr. Anglin personally guaranteed Anglin Automotive's performance under each agreement. *Id.* ¶¶ 42, 48, 55, 62, 69; *see also id.*, Exh. A ("Everest Agreement") at 10; *id.*, Exh. B ("Novus Agreement") at 17-19; *id.*, Exh. D ("MCA Receivables Agreement") at 2, 7-8.[3] According to Plaintiffs, these agreements were styled as MCA agreements, but functioned as loans with oppressive terms that set forth, among other things, fixed daily payments ranging from $783.78 to $2,750, annual interest rates between 98% and 258%, and short repayment periods

---

[2] As discussed at *infra* I.B, Silverline is no longer a defendant in this case.

[3] The Court uses the pagination generated by the Electronic Case Filing system when citing to exhibits attached to the Complaint.

ranging from 37 to 185 business days.  Complaint ¶¶ 30-32.  And, as alleged, Anglin Automotive was "forced" into taking each subsequent MCA to "keep up the payments" on each preceding one. *Id.* ¶ 5.

The Court limits its present factual discussion to Anglin Automotive's agreements with the Moving Defendants.  Anglin Automotive entered into the subject agreement with Everest on June 2, 2022,[4] *id.* ¶ 72; Everest Agreement at 2, with Novus on July 15, 2022, Complaint ¶ 43; Novus Agreement at 2, and with MCA Receivables on September 19, 2022, Complaint ¶ 57 (alleging that the transaction occurred on or about September 1, 2022); MCA Receivables Agreement at 2, 10, 11 (repeatedly showing a date of "9/19/2022").  On its face, each agreement describes the purchase and sale of Anglin Automotive's future receivables.  Each also lists a purchase price, a purchased amount, a specified percentage, and terms under which Anglin Automotive authorizes the corresponding Defendant to withdraw daily a specified amount from the designated bank account.

For instance, the Everest Agreement provides that "Seller [Anglin Automotive] hereby sells, assigns and transfers to Purchaser [Everest], without recourse, upon payment of the Purchase Price, the Purchased Amount of Future Receipts by delivering to Purchaser the Specified Percentage of the proceeds of each future sale by Seller."  Everest Agreement at 2.  It lists a "Purchase Price" of $100,000.00, a "Purchased Amount" of $145,000.00, and a "Specified Percentage" of 15%.  *Id.*  The Agreement further specifies an "Amount Remitted to Seller" of $98,260.00, itemizing $1,740.00 in fees taken by Everest.  *Id.* at 2.  Under the Agreement's terms, Anglin Automotive initially authorizes Everest to withdraw $783.78 each day from the "Designated Bank Account."  *Id.* at 3, 12.

---

[4] Plaintiffs first allege that they entered into the Everest Agreement on June 28, 2022, Complaint ¶ 37, and later allege that they did so on June 2, 2022, *id.* ¶ 72, which is the date provided in the annexed agreement, *see* Everest Agreement at 2.

The Novus Agreement provides that "Seller [Anglin Automotive] is desirous to sell to NCF [Novus], and NCF is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement."  Novus Agreement at 3.  It lists a "Purchase Price" of $70,000.00, a "Purchase Amount" of $104,930.00, a "Specified Percentage" of 12%, a "Daily Installment" of $874.42, and an "Origination Fee" of $4,900.00.  *Id.* at 2, 21; *see also* Complaint ¶ 43 ("Novus only funded $65,100.00 attributing the balance to a $4,900.00 origination fee.").

The MCA Receivables Agreement provides that "Merchant [Anglin Automotive] hereby sells, assigns and transfers to AFG [MCA Receivables] (making AFG the absolute owner) in consideration of the 'Purchase Price' specified above, the Purchased Percentage of all of Merchant's Future Receipts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third party payors . . . for the payments to Merchant as a result of the sale of goods and/or services . . . until the 'Purchased Amount['] has been delivered by or on behalf of Merchant to AFG."  MCA Receivables Agreement at 2.  It lists a "Purchase Price" of $75,000.00, a "Purchased Amount" of $100,050.00, a "Purchased Percent[age]" of 45%, and a daily remittance of $2,750.00 to be paid through automatic deductions from Anglin Automotive's bank account.  *Id.*

Each of the subject agreements also contains a mandatory reconciliation provision that (1) outlines the procedures through which Anglin Automotive may request an adjustment to the daily payment amount and (2) subsequently obligates the Defendant to perform the reconciliation.  *See* Everest Agreement at 3 (providing that Seller may request a reconciliation once a month, and that Purchaser "shall" adjust the daily payment within four business days of reasonable verification of information provided by Seller);  Novus Agreement at 5 (providing that Seller may request a

reconciliation "at any time" and that Purchaser "shall" adjust the daily payment within five business days following receipt of such request); MCA Receivables Agreement at 3 (providing that Merchant may request reconciliation once a month, and that MCA Receivables "shall" perform such reconciliation, "if applicable," within five business days of receipt of the request). And each agreement includes express language denying the existence of a fixed payment schedule or an interest rate in connection with the purchase. *See* Everest Agreement at 3 ("There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Purchaser."); Novus Agreement at 8 ("NCF [Novus] does not charge Seller and will not collect from Seller any interest on the monies used by NCF for the purchase of the Purchased Future Receipts. The period of time that it will take NCF to collect the Purchased Amount is not fixed . . . ."); MCA Receivables Agreement at 2 ("[T]here is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [MCA Receivables].").

Despite these stated terms, the agreements are alleged to function as usurious loans. Indeed, on Plaintiffs' telling, Defendants were only "pretend[ing] to be purchasing" the specified percentage of Anglin Automotive's future receivables. Complaint ¶¶ 41, 47, 61. As alleged, under the terms of the subject agreements, Anglin Automotive "was required to re-pay" the specified "purchased amount" over a fixed number of daily payments. *Id.* ¶¶ 38 (alleging that the Everest Agreement "required [Anglin Automotive] to re-pay the sum of $145,000.00 over 185 daily payments (roughly an 8 ½ month term)"), 44 (alleging that the Novus Agreement "required [Anglin Automotive] to re-pay the sum of $104,930.00 over 120 daily payments (roughly a six month term)"), 58 (alleging that the MCA Receivables Agreement "required [Anglin Automotive] to re-pay the sum of $100,050.00 over 37 daily payments (roughly a one and one-half month

term)").  And Plaintiffs claim that the rates of interest on the "money provided" by Defendants under the agreements, "if annualized," come out to 98% as to the Everest Agreement, *id.* ¶ 40, 155% as to the Novus Agreement, *id.* ¶ 46, and 258% as to the MCA Receivables Agreement, *id.* ¶ 60.

Moreover, Novus and MCA Receivables purportedly took a security interest in all of Anglin Automotive's assets and "filed a UCC-1 on all assets of the company including its equipment, inventory, etc."  *Id.* ¶¶ 49, 63; *see also* Novus Agreement at 11 (granting Novus a "continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to . . . all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory" and "all Seller's proceeds"); MCA Receivables Agreement at 7 (granting MCA Receivables a "security interest in and lien upon all of [Anglin Automotive's] present and future: and lien upon all of their present and future: (a) accounts [], chattel paper, documents, equipment, general intangibles, instruments, and inventory . . . (b) all proceeds . . . (c) funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds . . .  (d) present and future Electronic Check Transactions, and (e) any amount which may be due to AFG under this Agreement").  Finally, Plaintiffs allege that the reconciliation provision in each agreement was a "sham," and that "[o]n information and belief" none of the MCA-Funder Defendants "actually has a reconciliation department," performs reconciliations, or has ever refunded a merchant money as required under each provision. Complaint ¶¶ 86, 91, 126.  In fact, Plaintiffs claim that Anglin Automotive "requested a reconciliation be performed . . . but each time the MCA-Funder Defendant refused to perform the required reconciliation."  *Id.* ¶ 127.

As a result of these "deceptive and lopsided agreements," Anglin Automotive finds itself "in [a] spiral of unending debt," *id.* ¶ 128, and thus seeks to hold accountable not only the MCA-Funder Defendants but also "the various officers, owners, and investors" (parties to this action as John and Jane Doe Defendants) of each of these entities, *id.* ¶ 141; *accord id.* ¶¶ 16, 140, 142-145. Plaintiffs allege that each MCA-Funder Defendant "together with its respective [] officers, owners, and investors, are associated in fact and through relation for the common purpose of carrying on an ongoing unlawful enterprise," and that "each Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states." *Id.* ¶ 147.  They further claim that each "Enterprise" also committed wire fraud in connection with the above-described conduct. *Id.* ¶¶ 150, 151.

## B.    Procedural History

Plaintiffs commenced this action on February 20, 2023, bringing claims for a substantive RICO violation, as prohibited by 18 U.S.C. § 1962, Complaint ¶¶ 131-169 (Count One); RICO conspiracy, as prohibited by 18 U.S.C. § 1962(d), *id.* ¶¶ 170-180 (Count Two); and breach of contract, *id.* ¶¶ 181-183 (Count Three), against all Defendants.[5]

---

[5] The Complaint does not specifically allege the basis for subject matter jurisdiction over Count Three, instead only alleging that "[t]his Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption [sic] Organizations Act, 18 U.S.C. §§ 1961–68."  Complaint ¶ 17. Plaintiffs do not even allege facts that would establish either the necessary amount-in-controversy or the citizenship of the parties for diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  *See, e.g.*, *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012) ("[A] limited liability company . . . takes the citizenship of each of its members."); *Handelsman v. Bedford Vill. Assocs. L.P.*, 213 F.3d 48, 51-52 (2d Cir. 2000) (same proposition). The Court therefore assumes that Plaintiffs are relying on this Court's exercise of supplemental jurisdiction over Count Three pursuant to 28 U.S.C. § 1367.

Plaintiffs served each of Everest, Novus, MCA Receivables, and Five G Funding between February 28, 2023 and March 6, 2023, *see* Dkts. 34, 35, 37, 38, but failed to properly serve Silverline, *see* Dkt. 36 (indicating service was attempted on March 1, 2023). After Plaintiffs continued to fail to serve Silverline, despite being granted significant leeway to do so, *see, e.g.*, Dkt. 41, the Court dismissed the case in its entirety as to Silverline without prejudice and terminated Silverline as a party. *See Anglin Auto. LLC v. EBF Holdings, LLC*, No. 23 Civ. 1404 (JPC) (SLC), 2023 WL 5447268, at *2 (S.D.N.Y. Aug. 24, 2023).

Meanwhile, Everest moved for dismissal on May 1, 2023. *See* Dkts. 19, 20 ("Everest Motion"), 21. MCA Receivables follow with its motion to dismiss on June 16, 2023, *see* Dkts. 27, 28 ("MCA Receivables Motion"), and Novus on July 19, 2023, *see* Dkt. 43 ("Novus Motion"). Plaintiffs filed an omnibus opposition brief on July 23, 2023. *See* Dkt. 44 ("Opposition"). Each Defendant replied. *See* Dkts. 48 ("Everest Reply"), 51 ((Novus reply brief), 52 ("MCA Receivables Reply"). Plaintiffs, Novus, and Everest thereafter submitted letters to the Court, alerting it of supplemental authority in further support of their respective positions. Dkts. 64, 66, 67. Finally, on September 15, 2023, Plaintiffs moved for default judgment against Five G Funding, which has yet to appear in this action or otherwise respond to the Complaint. *See* Dkts. 62, 63, 65.

## II.  Legal Standard

To survive a motion to dismiss for failure to state a claim, a complaint must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

9

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Indeed, the plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it "need not consider conclusory allegations or legal conclusions couched as factual allegations," *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted).

### III. Discussion

As previously mentioned, Plaintiffs assert three causes of action: a substantive RICO claim, a RICO conspiracy claim, and a breach of contract claim. The Moving Defendants urge dismissal of all three claims on substantially similar grounds. First, as to Plaintiffs' substantive RICO claim, they contend that Plaintiffs have failed to plausibly allege a collection of an unlawful debt, a pattern of racketeering activity, an enterprise, and any harm. *See* Everest Motion at 6-23; Novus Motion at 9-26; MCA Receivables Motion at 5-14. Second, they argue that the RICO conspiracy claim necessarily fails, given Plaintiffs' failure to plead a substantive RICO claim. *See* Everest Motion at 23-24; Novus Motion at 26; MCA Receivables Motion at 15. And third, they urge this Court to decline to exercise supplemental jurisdiction over Plaintiffs' breach of contract claim, which the Moving Defendants maintain is, in any event, predicated on a bare recitation of legal elements. *See* Everest Motion at 24; Novus Motion at 26; MCA Receivables Motion at 15-16.

Faced with these numerous and colorable challenges, Plaintiffs, who are counseled, respond only to Defendants' contention that the substantive RICO claim fails because the subject agreements do not involve the collection of an unlawful debt. They fail to address the various

alternate and independent grounds for dismissal of that claim, and they do not even attempt to defend their RICO conspiracy and breach of contract claims. Based on this failure alone, this Court could well deem all three of Plaintiffs' claims abandoned. *See Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("'[W]hen a party fails adequately to present arguments' in a brief, a court may properly 'consider those arguments abandoned.'" (quoting *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004)); *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *see also DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018) (collecting cases where courts found that plaintiffs abandoned their claims by failing to address them when opposing dispositive motions). And, indeed, certain of the Moving Defendants urge this Court to do just that. Everest Reply at 8-9; MCA Receivables Reply at 3, 5. The Court will nonetheless reach the merits of the Moving Defendants' arguments—in accordance with courts' "strong preference for resolving disputes on the merits," *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (citation omitted)—and considers each claim in turn.

### A.     RICO Claims

#### 1.     Substantive RICO Claim

To prevail on a substantive RICO claim, a plaintiff must show: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (citation omitted). Regarding the first element, as relevant here a violation of 18 U.S.C. § 1962 may stem from Section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Accordingly, to establish a Section 1962(c) violation, a plaintiff must allege, among other requirements, the existence of an enterprise. *Paul Hobbs Imports Inc. v. Verity Wines LLC*, No. 21 Civ. 10597 (JPC), 2023 WL 374210, at *8 (S.D.N.Y. Jan. 24, 2023) (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)).

Here, Plaintiffs attempt to plead both the collection of an unlawful debt—predicated on the notion that the MCA agreements were loans in disguise—and a pattern of racketeering activity based on wire fraud. Complaint ¶¶ 130-169. As alluded to earlier, Everest, Novus, and MCA Receivables each contend that their respective agreements were not loan agreements, that Plaintiffs' wire fraud allegations fail to plausibly make out a pattern of racketeering activity, that Plaintiffs have failed to plead an enterprise, and that Plaintiffs have failed to allege any injury to their business or property. *See* Everest Motion at 6-23; Novus Motion at 9-26; MCA Receivables Motion at 5-14.

The Court first considers whether Plaintiffs have adequately pleaded a RICO enterprise. "[T]he RICO statute defines an 'enterprise' as 'includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *DeFalco*, 244 F.3d at 306-07 (second alteration in original) (quoting 18 U.S.C. § 1961(4)). The enterprise can be any "ongoing organization, formal or informal" that "function[s] as a continuing unit." *United States v. Morales*, 185 F.3d 74, 80 (2d Cir. 1999) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Members of an association can form a RICO enterprise only if they "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Cruz v.*

*FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citation omitted).  In other words, a RICO enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 625 (2d Cir. 2020) (quoting *United States v. Boyle*, 556 U.S. 938, 946 (2009)).

Moreover, the text of Section 1962(c)—in describing the culpability of a "person" conducting the affairs of an "enterprise"—"clearly envisions separate entities."  *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 343-44 (2d Cir. 1994). Accordingly, "[i]t is well established in this Circuit that, under [Section] 1962(c), the alleged RICO 'person' and RICO 'enterprise' must be distinct."  *DeFalco*, 244 F.3d at 307 (citation omitted); *accord Cedric Kushner Promotions*, 533 U.S. at 161 (explaining that a plaintiff asserting a RICO claim arising under Section 1962(c) "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").  The Second Circuit has "made clear that, by virtue of the distinctness requirement, a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)." *Riverwoods Chappaqua Corp.*, 30 F.3d at 344.  A plaintiff cannot circumvent this requirement "by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant."  *Id.*; *cf. Cruz*, 720 F.3d at 121 ("We have held that corporations that are legally separate but 'operate within a unified corporate structure' and 'guided by a single corporate consciousness' cannot be both the 'enterprise' and the 'person' under § 1962(c)." (citation omitted)).  Stated differently, where, as here, a plaintiff seeks to hold the corporation itself liable as a RICO "person," the RICO

13

"enterprise" may not then "consist solely of the corporation plus its owners and/or employees." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 536 (S.D.N.Y. 2014).[6]

Yet that is precisely the type of "enterprise" Plaintiffs here describe.  Indeed, in attempting to plead multiple association-in-fact enterprises, each consisting of an MCA-Funder Defendant and its agents and owners (all of whom Plaintiffs seek to hold liable as a "RICO person," *see* Complaint ¶ 140), Plaintiffs assert: "Each of the MCA-Funders, together with its respective [] officers, owners, and investors are associated in fact and through relations for the common purpose of carrying on an ongoing unlawful enterprise." *Id.* ¶ 147.  None of these "officers, owners, and investors" are identified in the Complaint; rather, they are implicated as John and Jane Doe Defendants.  *See id.* ¶ 16 ("The John/Jane Doe Defendants are the various officers and owners of each of the Defendants, as well as the investors in these corporate Defendants, who participated in this illegal scheme and whose identities will be sought during the course of discovery in this case.").  Despite apparently being unaware of these individuals' identities or the precise nature of their participation in the alleged scheme, Plaintiffs nonetheless allege that "members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for": (1)"the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise," *id.* ¶ 148 (in connection Plaintiffs' unlawful collection of debt theory); and (2) "the purpose of collecting upon fraudulent fees through electronic wires," *id.* ¶ 150 (in connection with Plaintiffs'

---

[6] The distinctness requirement may be met, however, where a plaintiff "alleges a corporation itself to be the RICO 'enterprise,' with its owners or employees being the RICO 'persons' conducting the affairs of the corporation through a pattern of racketeering activities." *4 K & D Corp.*, 2 F. Supp. 3d at 536 (citing *Cedric Kushner Promotions*, 533 U.S. at 163).  That is not the case here.  *See* Complaint ¶ 140 (alleging that each of the MCA-Funder Defendants is a "person" for purposes of RICO liability).

wire fraud theory). Finally, in describing the roles of the John and Jane Doe Defendants, Plaintiffs

assert:

> Each of the MCA-Funder Defendants are operated as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to his/her/its membership in an Enterprise, the John/Jane Doe Defendants who are the owners and officers of each Enterprise has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with the John/Jane Doe Investor Defendants to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining [sic] the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

*Id.* ¶ 158.

It is plain on the face of these allegations that each of these "enterprises" is nothing more

than the respective MCA-Funder Defendant. Each "enterprise" consists merely of a corporate

defendant and its corresponding John and Jane Doe owners, employees, and investors. *See*

*DeFazio v. Wallis*, 500 F. Supp. 2d 197, 209 (E.D.N.Y. 2007) (finding that the distinctiveness

requirement was not met where the plaintiffs described the RICO enterprise as the corporate

defendant and named individuals alleged to be owners, officers, and shareholders of the corporate

defendant and/or its affiliates). And these John and Jane Doe Defendants are merely alleged to

be "carrying on the regular affairs" of the respective MCA-Funder Defendant. *Riverwoods*

*Chappaqua Corp.*, 30 F.3d at 344. Indeed, Plaintiffs assert that the MCA-Funder Defendants

regularly disguise usurious loan agreements as bona fide merchant cash advance agreements to

collect unlawful debts, *see, e.g.*, *id.* ¶¶ 26, 86, 158, and further allege that the John and Jane Doe

Defendants undertake the steps required to effectuate that aim, *see id.* ¶ 158. Nothing in the

Complaint suggests that the John and Jane Doe Defendants, in setting up these agreements and

collecting the resultant debts, acted beyond "the regular affairs of the corporation." *See*

*Riverwoods Chappaqua Corp.*, 30 F.3d at 344 (discussing with approval *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 440-41 (5th Cir. 1987), in which the Fifth Circuit found that the plaintiffs failed to meet the distinctness requirement in alleging an association-in-fact comprised of a bank, its holding company, and its employees, given the absence of any evidence that they "were associated in any manner apart from the activities of the bank"); *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp. 2d 343, 352 (S.D.N.Y. 2010) (explaining in the context of the distinctness requirement that where the corporate defendant's agents are alleged to participate in the very racketeering activity alleged to constitute the corporate defendant's "regular way of conducting" its business,  the agents' conduct cannot be considered as occurring "beyond the regular affairs of the corporation").[7]  The Court thus finds that Plaintiffs have failed to plead a distinct enterprise.

As this conclusion is dispositive of Plaintiffs' substantive RICO claim, the Court declines to address the Moving Defendants' various other arguments, notwithstanding their cogency.  *Cf. Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 270 (S.D.N.Y. 2006) ("Since we conclude that the plaintiff has not adequately alleged a RICO enterprise, we need not address other arguments raised by the defendants in support of their motions to dismiss.").

---

[7] Nor does it make a difference that the "regular affairs" of the corporate defendant are alleged to constitute unlawful conduct.  *See Reed Const. Data*, 745 F. Supp. 2d at 352 ("However, there is no requirement that the 'regular affairs' described in *Riverwoods* be limited to lawful conduct or conduct officially sanctioned by the corporation."); *see also R.C.M. Exec. Gallery Corp. v. Rols Cap. Co.*, 901 F. Supp. 630, 640-41 (S.D.N.Y. 1995) (dismissing RICO claims for lack of distinctness and noting that "an alleged association-in-fact does not have an existence apart from the [corporation] merely because the alleged racketeering activities are not legitimate [corporate] activities").

### 2.    RICO Conspiracy Claim

Plaintiffs have also alleged that each MCA-Funder Defendant violated section 1962(d) by conspiring to commit the substantive RICO violation described in Count One of the Complaint. Complaint ¶¶ 170-180.

"To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d) . . . [a] plaintiff must prove (1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner (although not necessarily by the commission of any RICO predicate acts himself)." *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 340 (S.D.N.Y. 2019) (ellipsis in original) (citation, emphasis, and quotation marks omitted). Plaintiffs' conspiracy claim fails for two independent reasons.

First, because Plaintiffs' conspiracy claim is predicated entirely on an agreement to participate in the alleged loan scheme that the Court has already concluded fails to constitute a substantive civil RICO violation, Plaintiffs' conspiracy claim necessarily fails as a matter of law. *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 126 (2d Cir. 2018) ("The alleged conspiracy involved an agreement to commit the same substantive RICO violations we have deemed insufficiently pled, and the plaintiffs have not alleged any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering.  The plaintiffs therefore failed to plead the necessary agreement to violate RICO's substantive provisions." (citation omitted)); *see also Salinas v. United States*, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense.").

Second, even had Plaintiffs adequately pleaded a substantive civil RICO violation, the Complaint is still devoid of nonconclusory allegations of "the existence of an agreement to violate RICO's substantive provisions." *Cofacrèdit S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999) (internal quotation marks and citation omitted).  Indeed, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990).  Conclusory, boilerplate allegations as to the existence of the relevant agreement are insufficient.  *See, e.g.*, *4 K & D Corp.*, 2 F. Supp. 3d at 545 (dismissing a RICO conspiracy count when "[o]ther than one conclusory allegation that the defendants 'agreed' to commit the violations, the plaintiffs have alleged no facts to show specifically that the defendants had any 'meeting of the minds' in the alleged violations" (citation omitted)); *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004) ("Conclusory allegations that 'all of the defendants conspired among themselves to further the scheme to defraud' and 'knowingly and willingly participated in the conspiracy' are insufficient.").

Such boilerplate allegations are all that Plaintiffs here provide.  *See, e.g.*, Complaint ¶¶ 171 ("Each Defendant has unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed, together with the other members of his/her/its Enterprise, to violate 18 U.S.C. § 1962(c) as describe [sic] above, in violation of 18 U.S.C. § 1962(d)."); 173 ("Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of an Enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreements, in violation of 18 U.S.C. § 1962(c).").  In the absence of any factual allegations supporting the existence of an agreement among the Defendants, Plaintiffs' conspiracy claim fails.

### 3.    RICO Claims Against Non-Appearing Defendant Five G Funding

Because Plaintiffs' enterprise-related allegations are identical for each named Defendant in this case, the Court *sua sponte* dismisses the RICO claims against Defendant Five G Funding, who has not appeared in this action.

It is well established that a court may conclude on its own accord that a plaintiff has failed to state a claim against a non-appearing defendant, so long as the plaintiff was given "an opportunity to be heard" on the pertinent issue. *Antidote Int'l Films, Inc. v. Bloomsbury Pub., PLC*, 467 F. Supp. 2d 394, 399 (S.D.N.Y. 2006); *see also Hecht*, 897 F.2d at 26 n.6 (finding proper the district court's dismissal of the complaint with respect to all defendants, including a non-appearing defendant, "because the issues concerning [that defendant were] substantially the same as those concerning the other defendants" and the plaintiff "had notice and a full opportunity to make out his claim against" the non-appearing defendant).  Here, the Court's analysis as to Plaintiffs' failure to allege a RICO enterprise (and the Court's consequent analysis as to Plaintiffs' RICO conspiracy claim) applies with equal force to Five G Funding, given that Plaintiffs bring the same enterprise-related related allegations against every Defendant, consistently lumping all named Defendants together as the "MCA-Funders" or the "MCA-Funder Defendants," *see, e.g.*, Complaint ¶¶ 146, 147, 150.  And there is no question that Plaintiffs had the full opportunity to address the relevant arguments in opposing the Moving Defendants' motions.

The Court thus dismisses Plaintiffs' RICO claims against Five G Funding, resulting in the dismissal of Counts One and Two in their entirety.

### B.    Breach of Contract Claim

Having dismissed Plaintiffs' federal claims, the Court turns to their state law breach of contract claim.  As mentioned, based on the allegations in the Complaint, this Court's ability to preside over this state law claim could be based only on supplemental jurisdiction pursuant to 28

U.S.C. § 1367.  *See supra* n.5.  Each of the Moving Defendants urges the Court to decline to exercise supplemental jurisdiction over that claim.  *See* Everest Motion at 24; MCA Receivables Motion at 15-16; Novus Motion at 26.

A district court "may decline to exercise supplemental jurisdiction over [a pendent state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).  The statute does not create a "mandatory rule to be applied inflexibly in all cases."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Nevertheless, the Second Circuit has held that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009) (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)); *see also Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 123-24 (2d Cir. 2006) (reversing a district court decision to retain supplemental jurisdiction over state law claims after dismissal of the federal claim, citing "the absence of a clearly articulated federal interest"); *Anderson v. Nat'l Grid, PLC,* 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("In the interest of comity, the Second Circuit instructs that absent exceptional circumstances, where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should abstain from exercising pendent jurisdiction." (internal quotation marks omitted)).

Here, the case is still in the early stages of litigation, discovery has not yet commenced, and comity dictates that Plaintiffs' breach of contract claim is better suited for resolution in state court.  *See Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 453 n.63 (S.D.N.Y. 2007) ("[A]t early stages in the proceedings, . . . little is to be gained by way of judicial economy from retaining jurisdiction.").  And Plaintiffs have provided no reason why the Court should deviate

from the usual practice of declining jurisdiction over related state law claims. Indeed, Plaintiffs do not even request that this Court exercise supplemental jurisdiction over their breach of contract claim if their RICO claims are dismissed. *See generally* Opposition. Finding that the balance of the relevant factors points toward declining to exercise supplemental jurisdiction over Plaintiffs' remaining state law claim, the Court dismisses Count Three without prejudice to Plaintiffs' refiling that claim in state court.

## C.    Leave to Amend

Lastly, the Court considers whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiffs have not asked the Court for leave to amend their Complaint. "But even when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte*." *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (citation and internal quotation marks omitted) (collecting cases). When deciding whether to *sua sponte* grant leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility." *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020) (citation omitted).

Having considered these factors, the Court grants Plaintiffs leave to file an Amended Complaint, in the event Plaintiffs believe that they can plead facts that would adequately state a claim upon which relief may be granted. Plaintiffs have not yet amended their Complaint, nor has discovery commenced. And as this case "is still in its infancy, there would be minimal prejudice to Defendant[s]" in granting leave to amend. *Id.* at *10. But once again, Plaintiffs should amend *only* if they are able to resolve the pleading deficiencies outlined in this Opinion and Order. In

21

addition, the Court strongly advises Plaintiffs to also consider the Moving Defendants' substantive challenges that are not addressed in this Opinion and Order in deciding whether to file an Amended Complaint.

## IV.  Conclusion

For the foregoing reasons, the motions to dismiss, Dkts. 19, 27, 43, are granted, Plaintiffs' motion for a default judgment against Defendant Five G Funding LLC, Dkt. 62, is denied, and Plaintiffs' claims against Defendant Five G Funding LLC are dismissed without prejudice.  Should Plaintiffs decide to amend their Complaint, they must do so within thirty days of this Opinion and Order.  If Plaintiffs fail to file an amended complaint within thirty days or obtain an extension of time to do so by that date, the Court will dismiss Counts One and Two with prejudice and dismiss Count Three without prejudice so that Plaintiffs may re-file their state law claim in state court. The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 19, 27, 43, and 62.

SO ORDERED.

Dated: March 14, 2024
       New York, New York

_____
            JOHN P. CRONAN
         United States District Judge